JOURNAL ENTRY and OPINION.
{¶ 1} Appellants Joseph and Mary Roth (Roths) appeal from the trial court's granting partial summary judgment in favor of William and Sherri Habansky (Habanskys) on the issue of specific performance of a real estate contract and denying the Roths' alternate claim for money damages. The Roths assign the following errors for our review.
 {¶ 2} "I. The trial court erred in finding that plaintiffs-appellants were not entitled to the remedy of specific performance."
 {¶ 3} "II. The trial court erred in granting defendant-appellees [sic] motion for summary judgment on the issue of specific performance as there were genuine issues of material fact."
 {¶ 4} "III. The trial court erred in finding that plaintiffs-appellants were not entitled to money damages for the difference in the fair market value of defendants-appellees' real property at the time the parties entered into a real estate contract and the time of appellees' breach of said contract."
 {¶ 5} Having reviewed the record and pertinent law, we affirm the judgment of the court. The apposite facts follow.
 {¶ 6} On September 1, 2000, the Roths executed a purchase agreement with the Habanskys for the sale of Habanskys' custom built home located in the Quail Hollow Development in Westlake, Ohio. The home was listed for $975,000, and after negotiations, they agreed on a contract price of $950,000, which included certain items of personal property. Three weeks after the execution of the purchase agreement, the Habanskys breached. Roth filed suit seeking specific performance of the contract, and in the alternative, requested money damages.
 {¶ 7} The Roths and the Habansky filed motions for summary judgment on the issue of specific performance of the real estate contract. The trial court granted partial summary judgment in favor of the Habanskys, and set trial to address the issue of money damages for breach of the real estate contract.
 {¶ 8} At the bench trial, Joseph Roth testified he and his wife had been looking for a house for two years prior to executing the sales contract with the Habanskys. He was specifically looking in the Quail Hollow Development where the Habanskys lived. The Roths looked at the Habansky's home and was impressed with what they believed to be the home's many unique features. Joseph Roth further testified, even though the parties settled on a contract price of $950,000, he thought the list price of $975,000 was a very good price. He thought the house valued in the range of 1.1 million dollars,[1] a conclusion he arrived at based on his expertise as a certified public accountant and his personal knowledge of the homes in the area.
 {¶ 9} Joseph Roth testified he met with the Habanskys about three weeks after they executed the contract, and the Habanskys expressed second thoughts about going forward with the transaction. In the interim, the Roths contracted and sold their home. Thereafter, for the next six months the Roths rented a condominium at the Quail Hollow Development. The Roths then bought a house four doors from the Habanskys. Joseph Roth testified he paid $695,000 for the property and expended another $35,000 for renovations.
 {¶ 10} Appraiser John Cooney testified he was hired by the Roths to do an appraisal on the Habanskys' house as of September 15, 2000, the date of the proposed sale. Cooney was a staff appraiser with the Cuyahoga County Auditor's office, and had his own real estate appraisal company. He also testified at length regarding the subject property, and said he ultimately appraised the Habanskys' house for $1,070,000, a figure he arrived at by using the sales comparison approach.
 {¶ 11} On cross-examination, Cooney admitted he had only received his appraisal license in February 2001, even though he had been employed as an appraiser for the County Auditor's office for five years. He testified Joseph Roth told him the contract price was a bargain, and it was based on a lot of the extra fixtures and unique features of the home. He conceded Roth gave him a list of the house features he wanted Cooney to pay close attention to, because he felt they were important. Cooney's testimony revealed many of the items on the list which Roth provided ended up verbatim on his appraisal report. On the list Roth provided to Cooney, it mentions "the front door is imported wood and is handmade." On Cooney's addendum it states the same. Cooney conceded he did not do any independent investigation to determine if in fact the wood used on the front door was imported.[2]
 {¶ 12} Habansky testified he and his wife decided to sell their home in the Quail Hollow Development, because their son was getting older and they were looking for a neighborhood with more children and a larger yard. Consequently, in August 2000, Habansky contacted Donna Miller, a real estate agent known to deal in expensive homes. Miller recommended a price range between $855,000 and $960,000. Consequently, Habansky listed the home for $975,000.
 {¶ 13} Habansky testified he met with Joseph Roth about three weeks after they executed the purchase agreement. He informed Roth they had discovered an omission in the sales contract. The original listing provided Habanskys would not sell their home unless they entered an agreement to purchase another. However, when the Habanskys attempted to exercise that right they were told it was not contained in the sales contract. He testified to telling Roth if he decided to move within the next two years he would sell the house to Roth at the current contract price of $950,000.
 {¶ 14} Habansky's appraiser, Bruce Buckholz, testified he had been an appraiser for twenty-five years; a licensed real estate appraiser since 1991; a certified real estate appraiser, which qualified him to appraise properties worth over one million dollars; and that he had appraised four or five homes in the Quail Hollow Development. He appraised the Habanaskys' home for $900,000. He testified at length regarding the process through which he arrived at the value.
 {¶ 15} Following the bench trial, the court held no damages were recoverable as a result of Habansky's breach. Roth now appeals. In his first assigned error, Roth contends it was an abuse of discretion for the trial court to find he was not entitled to the remedy of specific performance.
 {¶ 16} The remedy of specific performance is governed by the same general rules which control the administration of all other equitable remedies. The right to it depends upon elements, conditions, and incidents, which equity regards as essential to the administration of all its peculiar modes of relief. When all these elements, conditions, and incidents exist, the remedial right is perfected in equity. These elements, conditions, and incidents, as collected from the cases, are the following: The contract must be concluded, certain, unambiguous, mutual, and upon a valuable consideration; it must be perfectly fair in all its parts; free from any misrepresentation or misapprehension, fraud or mistake, imposition or surprise; not an unconscionable or hard bargain; and its performance not oppressive upon the defendant; and finally, it must be capable of specific execution through a decree of the court.[3]
 {¶ 17} Specific performance of contracts is a matter resting in the sound discretion of the court, not arbitrary, but controlled by principles of equity, on full consideration of the circumstances of each particular case. The standard of review in a case such as this is whether the trial court, sitting as a court of equity, abused its discretion.[4]
 {¶ 18} "The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations. In order to have an abuse of that choice, the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias."[5]
 {¶ 19} The trial court concluded the enforcement of the real estate contract would be oppressive to the Habanskys. It is well established that specific performance will not be granted where it will cause unreasonable hardship, loss or injustice to the party in breach.[6]
As noted by the Ohio Supreme Court, "it makes no difference whether the circumstances which render the claim for specific performance, when made, inequitable, arose prior or subsequent to the date of the contract sought to be enforced."[7]
 {¶ 20} The trial court found that specific performance of the contract was oppressive because of hardship. It is without question the Habanskys breached the contract to sell their home to the Roths. It is undisputed the real estate listing included a contingency clause whereby the Habanskys would not sell their house until they had purchased another. Because these clauses have become standard provisions in listing agreements, one could assume, but for negligence, the Habanskys intended the purchase agreement to contain the same clause. The record reflects the Habanaskys contracted to purchase another home, but did not complete the purchase when they discovered the house had a water drainage problem. The Habanskys informed the Roths within three weeks of executing the purchase agreement to alert them to this change in circumstances. Further, William Habansky testified to telling Joseph Roth he would sell the house to him for the same price if he decided to move within the next two years. We believe the aforementioned factors, coupled with the trial court's assessment that the Habanskys were not trying to sell their house to another buyer for more money, demonstrated good faith.
 {¶ 21} This court takes note that two months after the Habanskys breached the real estate contract, the Roths contracted and sold their house; rented a condominium for the next eight months; continued to look at other houses; and subsequently went on to purchase a home four doors down from the Habansky's home. In light of the fact the Roths purchased another home and in considering the hardship it would cause the Habanskys to move from their home, we conclude the trial court did not abuse its discretion by not granting the remedy of specific performance. Accordingly, we overrule the Roths' first assigned error.
 {¶ 22} In their second assigned error, the Roths argue the trial court erred in granting the Habanskys' motion for summary judgment on the issue of specific performance as there were genuine issues of material fact.
 {¶ 23} Because we found in the first assigned error the trial court did not abuse its discretion in denying the Roths the remedy of specific performance, this assigned error is moot and need not be addressed. App.R.12(A)(1)(c).
 {¶ 24} In their third assigned error, the Roths argue the trial court's decision denying monetary damages for the difference in fair market value of the Habanskys' home at the time the parties contracted and at the time of the breach was against the manifest weight of the evidence.
 {¶ 25} When evaluating whether a judgment is against the manifest weight of the evidence in a civil context, the standard of review is the same as that in a criminal context.[8] We must presume the fact-finder's findings were correct.[9] This presumption stems from the fact-finder's unique opportunity to use their observations of the witnesses to aid in making credibility assessments and resolving conflicting testimony.[10] As long as there exists competent and credible evidence in the record to support the fact-finder's decision, it will not be reversed as against the manifest weight of the evidence.[11]
 {¶ 26} It is well established when a breach of a real estate contract occurs "the proper measure of damages for a buyer's breach of a contract for the sale of real property is the difference between the original contract price and the fair market value of the property at the time of the breach."[12] Further, it is held that the party seeking to recover damages must not only present evidence of the resale price, but must also present sufficient evidence that the resale price was the true indicator of the fair market value at the time of the breach.[13]
 {¶ 27} Central to the determination of the Roths' third assigned error is the fair market value at the time of breach. In our review, this court seeks to analyze the competing interest of the various parties.
 {¶ 28} A home is generally considered one's biggest investment, therefore a homeowner will seek to obtain the highest resale value. William Habansky testified he consulted Donna Miller, a highly regarded real estate agent who deals in houses in the high end of the market. Additionally, Miller also lived in the Quail Hollow Development. Miller recommended the listing price be in the range of $855,000 and $960,000, no doubt a range, based on her experience, which was achievable. Based on these two reliable indicators, the Habanskys settled on a listing price of $975,000. It was reasonable for the Habanskys to rely on the expertise of real estate agent Donna Miller, who, based on her experience in the high end sector of the real estate market, and the fact she lived in the Quail Hollow Development, would be attuned to what a particular house would sell for.
 {¶ 29} Joseph Roth testified at length regarding the detail financial analysis he did on the homes sold in the Quail Hollow Development and surrounding area. Based on this he believed he received a bargain when he and the Habanskys agreed to a contract price of $950,000. He posited Habanskys' house should be valued at approximately $1,070,000.
 {¶ 30} In the negotiation that led to this arms length agreement between the parties, the Habanskys want to get the highest price without losing the sale; while the Roths want to get the lowest price without losing the house. Based on these two competing interests they agreed to a contract price of $950,000. This is the price both parties had to believe the market would bear and thus should rightly be regarded as the fair market value.
 {¶ 31} At trial, it was determined the Roths' appraiser, John Cooney, had limited experience appraising highly priced homes. He appraised the property at $1,070,000. However, it was determined at trial he relied heavily on a list of the home's features Roth furnished him. In some instances, information from the list appeared verbatim on his report, which appeared to be at times without any independent investigation. Cooney's appraisal at the very least seems highly influenced by Roth.
 {¶ 32} Bruce Buckholz, an appraiser with twenty-five years experience, certified to appraise homes valued at over one-million dollars, who had appraised four or more homes in the Quail Hollow Development, appraised the house at $900,000. Buckholz went through in detail how he arrived at this figure.
 {¶ 33} Having reviewed the record, and analyzed the competing interests of the parties who testified at the bench trial, we agree with the trial court's determination that the fair market value of the property at the time of the breach was the same as the contract price. The Habanskys' reliance on their very experienced real estate agent in determining the listing price of the home was well founded. Also, we look to the fact the Roths bought a home four doors away from the Habanskys for $695,000, and after expending $35,000 for renovations, brought the value to approximately $730,000. Consequently, the Buckholz' appraised value is comparable to the sales price and reasonable for the trial court to conclude the contract price the parties settled on was the fair market value of the home. The trial court also looked at the short time between the execution of the contract and the breach; thus, no market price changes.
 {¶ 34} Because there was no difference between the fair market value and the contract price, the Roths were not entitled to any damages. Accordingly, the Roths' third assigned error is overruled.
Judgment affirmed.
MICHAEL J. CORRIGAN, P.J., and JAMES J. SWEENEY, J., concur.
[1] Trial transcript at 56.
[2] Trial transcript at 119-120.
[3] Manning v. Hamamey (1998), Cuyahoga App. No. 72072.
[4] Id.
[5] Nakoff v. Fairview General Hospital (1996), 75 Ohio St.3d 254,256-257 (Citations omitted).
[6] Sternberg v. Board of Trustees of Kent State University (1974),37 Ohio St.2d 115, 118, citing Huntington v. Rogers (1859), 9 Ohio St. 511,512; Restatement of the Law 2d, Contracts (1979) 184, Section 364(1).
[7] Huntington, at 516.
[8] In re: Washington (May 10, 2001), Cuyahoga App. Nos. 77872 
77888, citing In re: Ozmun (Apr. 14, 1999), Summit County App. No. 18983.
[9] Intrinsics Int'l v. Coopers Lybrand (July 13, 2000), Cuyahoga App. No. 76516.
[10] Id. See, also, Leslie v. Briceley (Dec. 31, 1997), Washington App. No. 97CA10, appeal dismissed (1998), 81 Ohio St.3d 1497.
[11] C.E. Morris Co. v. Foley Construction (1978), 54 Ohio St.2d 279, at syllabus; Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80;Intrinsics Int'l, supra. See Myers v. Garson (1993), 66 Ohio St.3d 610,614, rehearing denied (1993), 67 Ohio St.3d 1439.
[12] E.K. Investments v. Kleckner (Nov. 27, 1991), 1st Dist. Nos. C-900364, C-900427, and C-900461.
[13] Loft v. Sibcy-Cline Realtors (Dec. 13, 1989), 1st Dist. No. C-880446.