DECISION AND JUDGMENT
{¶ 1} This is an appeal from a judgment of the Ottawa County Court of Common Pleas in favor of plaintiff-appellee, Lisa M. Fine, in her action for specific performance of a contract for the sale of a condominium unit, breach of contract, and violations of the Ohio Consumer Sales Practices Act ("CSPA"). In addition to an award of specific performance of the contract, the lower court awarded Fine economic damages of *Page 2 
$125,044, non-economic damages of $2,500, and attorney fees and expenses of $66,250, for a total damage and fee award of $193,794. Defendants-appellants, U.S. Erie Islands Development Co., Ltd. ("USEIDCO"), Edmund V. Gudenas, and RealAmerica, Inc., challenge the lower court's judgment through the following assignments of error:
 {¶ 2} "1. The trial court abused its discretion in awarding specific performance to appellee because she failed to show she was ready, willing and able to perform, and because she herself had not been honorable and fair in her dealings with appellants.
 {¶ 3} "2. The trial court erred in finding appellants as sellers liable to appellee as purchaser on their contract for the sale of a condominium unit being constructed for seller on Middle Bass Island, and in determining that the Consumer Sales Practices Act (CSPA) was applicable to the contract where the contract did not relate to either the sale of goods or services as required under R.C. 1345.01(A) for the CSPA to be applicable.
 {¶ 4} "3. Even assuming that the CSPA applied to the transaction between the parties, the trial court erred in determining that appellants violated the CSPA by informing appellee that she would have to pay a cost increase caused by circumstances beyond appellants' control in order to close on the purchase of the condominium.
 {¶ 5} "4. The trial court erred in awarding damages and attorney fees to appellee which are both contrary to equitable principles of an accounting ancillary to a decree of specific performance and clearly excessive and not supported by the evidence presented under the CSPA." *Page 3 
 {¶ 6} The facts of this case, as derived from the trial court's findings of fact and conclusions of law, as well as other matters of record, are as follows. On September 4, 2000, Lisa Fine as "buyer" and USEIDCO as "seller" signed documents captioned "St. Hazards Yacht Club Condominium Unit Purchase Agreement" and "Addendum No. 1" to that agreement. These documents together comprised the contract between the parties. Appellant Edmund Gudenas signed the documents as the president of USEIDCO. The contract specified a base price of $132,587 for condominium unit Y-312 at St. Hazards Yacht Club on Middle Bass Island in Ottawa County, Ohio, and stated that the base price was "exclusive of options and upgrades." At the top of the Unit Purchase Agreement, next to the heading "Deposit" is written $10,403. The Addendum, however, reads: "This is an addendum to and part of the above-identified agreement between Seller and Buyer(s) pursuant to which the Buyer(s) hereby order the options and upgrades checked below and Seller agrees to obtain and install the same, in the above-designated Unit[.]" The Addendum then lists basic prices for carpet, cabinets, counter tops, curtain rods, installation of those items, appliances, painting, electric fixtures and HVAC units, the amount for which totals $10,403. The Addendum further states: "Seller acknowledges receipt of check/cash in the above-stated amount * * * in payment for the above designated items."
 {¶ 7} Construction of the condominium project did not proceed as planned and appellants were forced to obtain a new contractor. In a letter dated December 15, 2001, to the St. Hazards Village on the Beach condominium buyers, Gudenas updated the *Page 4 
buyers on how the construction was proceeding and then stated: "As a no cost upgrade to you, we will install hand-carved, solid hardwood doors, imported directly from Indonesia and made just for this building. This is a $1,200 value per condo. The enclosed photos show what the doors look like. All have already been delivered to the island." Thereafter, on March 8, 2003, Gudenas again updated the condominium buyers in a letter which noted: "The architect has finished making all of the changes required by the Ottawa County Building Department. New permits should be issued by the end of March. Significant additions to the fire safety system had to be made. * * * All of the construction financing is in place. However, the entire project is being re-bid because of the long delay and changes."
 {¶ 8} In a letter dated April 25, 2003, Gudenas again notified the condominium buyers, including Fine, of issues surrounding the construction of the project. Gudenas stated that USEIDCO's costs for the condominium development project had increased due to a change of contractors and because of additional improvements and upgrades which were not part of the original plans. The letter stated that the original contractor, MCM construction, "did not bid the work properly and simply guessed at what it would cost." As a result, "the cost to finish [St. Hazards Yacht Club Condominium complex] is $3,112,002, * * * [or] $1,638,816 more than MCM, bid or an increase of 62%." Gudenas continued: "Some of the cost increase is because of new items we will provide and upgrades. One of the biggest is the fire suppression system. Ottawa County has strongly suggested we build to commercial, not residential, standards to avoid problems in the *Page 5 
future. This means including a sophisticated fire alarm system, sprinklers and a back-up generator for all emergency systems. We are also including extra sturdy and tall railings, solid carved wood doors, better insulation between units and fiber cement siding instead of vinyl. This is not a request to go to anywhere close to the current prices. It is a request to consider an increase in the old price to help pay for the upgrades and new expenses so that we can break even on this building."
 {¶ 9} Subsequently, on July 14, 2003, Gudenas, in a letter, again updated Fine and the other condominium buyers of progress on the project and addressed the issue of cost increases. This letter reads in pertinent part: "The original prices quoted are below the actual cost to build. Also, at least 10 important features that cost more than $12,000 per condo have been included. These were not part of the original specifications. Please see the enclosed list. We have not cut corners to reduce the construction budget. For instance, we could have used vinyl siding and saved about $100,000. Instead, long lasting fiber cement siding is being installed. The residential fire alarm system is being upgraded to a commercial system and additional water outlets on each floor are being installed. A lightning protection system for about $15,000 is now being included as is a back-up generator for emergency lights. Hollow doors, cheaper cabinets, lower quality tubs and showers and aluminum instead of steel railings also could have been used. These are just a few examples of how the quality is being increased. * * * Because of these additions all original prices must be increased by $10,500. This change does not equal all of the construction cost increases which is several times this amount. You're *Page 6 
still purchasing your condominium at or below actual building expenses and this represents a significant savings from current prices. An unmanageable loss would occur if all of the condos were sold at these prices. A full refund is available if you do not wish to proceed with your purchase. However, I hope you decide to continue the ownership process and take advantage of your large discount. Please use the enclosed form to let me know of your decision. We can also meet at the resort or discuss this over the phone * * * if you wish."
 {¶ 10} The enclosed form referred to in the letter of July 14, 2003, lists the following "Quality Extras For All St. Hazards Yacht Club Condominiums" at a total value of $12,200: fiber cement exterior siding, fire safety system to commercial standards, carved solid wood interior doors, black granite countertops throughout, solid raised cabinet doors, generator and emergency common area lighting, upgrade steel railings, upgrade fixtures and outlets, upgrade tubs and showers, upgrade utility room door. The enclosed form then asks the recipient to check one of the following options: "I agree to accept the listed items above for an additional $10,500 above the initial purchase price. I understand that some of the items are required for the purchase to be completed." or: "I do not wish to accept these extras and would like my initial payment refunded."
 {¶ 11} Fine did not check either option and did not respond to the letter of July 14, 2003. Nevertheless, Gudenas insisted in the proceedings below that in late May 2004, he met with Fine and her husband at the resort where Fine chose the upgraded cabinets and picked a paint color and appliance color. Fine agreed that she picked out her wall and *Page 7 
cabinet colors, but stated that she was never given a choice of cabinetry or countertops and understood these to be the options and extras included in the original contract price.
 {¶ 12} On December 8, 2004, Gudenas informed Fine that her unit was completed and indicated that the closing needed to take place by December 23, 2004. After Fine's mortgage company appraised the unit, however, Fine and her husband sent Gudenas a letter, dated December 16, 2004, which included a punch list of items that needed to be corrected in the condo. Based on this punch list, the Fines requested that $8,500 be escrowed. This figure reflected the difference in the appraised value of the property if closed "as is" versus the appraised value of the property if all work was completed. Gudenas only agreed to an escrow amount of $1,275 and Fine accepted that figure. In attempting to schedule a closing, however, Gudenas insisted that Fine pay the additional $10,500 for the granite countertops and other improvements. Fine refused, asserting that she had already paid for the improvements with her initial payment of $10,403 and that she had not signed anything in writing agreeing to pay for additional upgrades.
 {¶ 13} On December 27, 2004, Fine filed an action against appellants for specific performance, breach of contract and violations of the CSPA. In pretrial motion practice, appellants sought summary judgment on the issue of whether Fine was entitled to the protection of the CSPA. Appellants claimed that Fine was not entitled to the protection of the CSPA because the transaction at issue was a pure real estate transaction. The court disagreed and held as a matter of law that the CSPA applied to the transaction at issue *Page 8 
because it was a mixed transaction that involved both the transfer of goods and services and the transfer of real property.
 {¶ 14} The case proceeded to a bench trial on November 27, 2006 and January 29, 2007, at which the facts as set forth above were submitted. On June 17, 2007, the lower court issued a judgment entry with findings of fact and conclusions of law as follows. The court determined that the purchase agreement and addendum constituted the entire contract between the parties and that appellants breached the contract when they refused to tender Unit Y-312 to Fine for $142,990. The court further held that the $10,403 that Fine paid appellants upon signing the contract was a deposit and was not intended to be applied toward "options and upgrades" because it could not be both a deposit and a payment for options and upgrades. The deposit, however, was held for more than 90 days and was not placed into a trust or escrow account pursuant to the terms of the contract. The court next determined that because of cost overruns, appellants did not terminate the contract but, rather, sought to pass along the increases to Fine by increasing the cost of her unit by $10,500. This cost increase was not accepted by Fine. Fine was ready, willing and able to close on the condominium, but appellants insisted that the purchase of the unit would require the additional payment and refused to close unless Fine paid the additional amount. Based on the court's findings, the court concluded that appellants had breached the contract for the sale of Unit Y-312 when they refused to sell it to Fine for the agreed contract price and that Fine was entitled to specific performance of the contract and to be placed in the position she would have been in had the contract *Page 9 
been carried out on the date agreed upon. The court then ordered appellants to transfer the deed and title to Unit Y-312 for a total price of $142,990 within seven days of the date of the judgment. The court further held that appellants' actions violated the CSPA and that while Fine was not entitled to treble or punitive damages, she was entitled to attorney fees. The court then ordered that the matter be set for a hearing on the issue of damages.
 {¶ 15} The case proceeded to the damages hearing on September 10, 2007, at which Lisa Fine and Ed Gudenas testified and the parties submitted documentary evidence. Subsequently, the lower court issued a decision and judgment entry awarding Fine a total of $125,044 in economic damages. This award was comprised of the following:
 {¶ 16} Lost Wages $13,200
 {¶ 17} Rental value of condo since December 24, 2004 97,469
 {¶ 18} Carpet invoice 1,974
 {¶ 19} Mortgage appraisal fee 370
 {¶ 20} Interest on portion of deposit exceeding $2,000 2,280
 {¶ 21} Interest on bond 6,724
 {¶ 22} Travel expenses 1,626
 {¶ 23} Transcript fees 1,401
The court also awarded Fine $65,582 in attorney fees, $668 in attorney expenses and $2,500 in non-economic damages, for a total award of $193,794. Finally, the court *Page 10 
ordered that upon delivery of the deed (which had been held by an escrow agent) to Fine, appellants would receive a credit against the judgment for $132,587, representing the purchase price of $142,990 minus Fine's deposit of $10,403. Appellants now challenge the trial court's judgment and award of damages and attorney fees on appeal.
 {¶ 24} In their first assignment of error, appellants assert that the lower court erred in ruling that appellants breached the contract for the sale of the condominium and that Fine was entitled to specific performance of that contract.
 {¶ 25} Although appellants assert that the lower court abused its discretion in finding that they breached the contract, the appropriate standard of review in contract cases is whether the trial court erred as a matter of law. Schalmo Bldrs., Inc. v. Zama, 8th Dist. No. 90782,2008-Ohio-5879, ¶ 14. Accordingly, we "must determine whether the trial court's order is based on an erroneous standard or a misconstruction of the law." Continental W. Condo. Unit Owners Assn. v. Howard E. Ferguson,Inc. (1996), 74 Ohio St.3d 501, 502. In so doing, we must keep in mind that "an appellate court gives due deference to the trial court's findings of fact, so long as they are supported by competent, credible evidence." The Four Howards, Ltd. v. J F Wenz Road Investment,L.L.C, 6th Dist. No. L-07-1200, 2008-Ohio-6174, ¶ 63, citing State v.Clements, 5th Dist. No. 08 CA 31, 2008-Ohio-5549, ¶ 11.
 {¶ 26} A contract is a promise or a set of promises, the breach of which the law provides a remedy. Cleveland Builders Supply Co. v.Farmers Ins. Group of Cos. (1995), 102 Ohio App.3d 708, 712. A plaintiff must present evidence on several elements to *Page 11 
successfully prosecute a breach of contract claim. Donor v. Snapp
(1994), 98 Ohio App.3d 597, 600. The elements are the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff. Id.
 {¶ 27} It is undisputed that the parties entered into a contract for the sale of the condominium unit that appellants were to build. The total contract price for the unit was $142,990, which included $10,403 for "options and upgrades." The options and upgrades listed in the contract covered the cost of the carpet, cabinets, countertops, curtain rods, the installation of those items, appliances, painting, electric fixtures and HVAC units. The contract further provided that "[i]n the event that Seller is unable to fulfill its construction undertaking hereunder within a reasonable time hereafter because of weather, controls, regulations, restrictions, or allocations of labor, supplies, or materials instituted by any governmental authority, Seller shall return the deposit and payments for optional extras and upgrades and this agreement shall thereupon terminate." Finally, the contract also stated: "This agreement fully and completely sets forth the agreement between the parties and all previous understandings and agreements between the parties with respect to the subject matter of this agreement are merged herein. This agreement may not be changed or terminated orally."
 {¶ 28} Despite the above quoted provisions of the contract, when construction delays and cost overruns substantially increased the cost of the project, appellants did not terminate the contract as provided for in the contract but, rather, attempted to pass along the cost increases to Fine and other condominium buyers. Fine did not accept appellants' *Page 12 
proposed change in the contract price and never agreed to any change in its terms in writing, as required by the contract. Nevertheless, upon completion of the project, appellants refused to close unless Fine paid the additional $10,500. "It is well established that the increased cost of performance of a contractual term does not excuse non-performance.See Mason Tire Rubber Co. v. Cummins-Blair Co. (1927),116 Ohio St. 554. The rule as stated in the Restatement of Contracts § 467 is that: `facts existing when a bargain is made or occurring thereafter making performance of a promise more difficult or expensive than the parties anticipate, do not prevent a duty from arising or discharge a duty that had arisen.'" Richards v. Hidden Valley (Dec. 17, 1981), 8th Dist. No. 43486. The record demonstrates that Fine was ready, willing and able to close. Fine testified that at least twice she secured a mortgage from Huntington Bank only to have the mortgage expire when appellants refused to close. She also testified that at one time she offered to pay cash for the unit because of her frustration with appellants. Appellants breached the contract by refusing to close at the agreed upon price and the lower court did not err in making that finding.
 {¶ 29} Appellants further contend that the lower court erred in ruling that Fine was entitled to specific performance of the contract.
 {¶ 30} Generally, specific performance can be awarded if there was a valid enforceable contract that was breached. Tiffin v. Shawhan (1885),43 Ohio St. 178, paragraph two of the syllabus. The court's goal is to carry out what the parties had intended to do under the contract.Sandusky Properties v. Aveni (1984), *Page 13 15 Ohio St.3d 273, 276, quoting Hellkamp v. Boiman (1970), 25 Ohio App.2d 117, 122. "[A]n action for specific performance, any accounting that might be ancillary to it, and the award of any damages that may under the circumstances appear to be necessary, are matters in equity and may be determined by the trial court in its sound discretion." SanduskyProperties, supra at 274. The following factors are the general prerequisites to the award of specific performance: "The contract must be concluded, certain, unambiguous, mutual, and upon a valuable consideration; it must be perfectly fair in all its parts; free from any misrepresentation or misapprehension, fraud or mistake, imposition or surprise; not an unconscionable or hard bargain; and its performance not oppressive upon the defendant; and finally, it must be capable of specific execution through a decree of the court." Roth v.Habansky, 8th Dist. No. 82027, 2003-Ohio-5378, ¶ 16.
 {¶ 31} On appeal, the trial court's decision to grant specific performance will not be overturned absent a finding of abuse of discretion. Sandusky Properties, supra at 275. An abuse of discretion connotes more than a mere error of law or judgment; rather, an abuse of discretion requires a finding that the trial court's decision was unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
 {¶ 32} The record demonstrates that the parties entered into a valid contract on September 4, 2000, for the sale of the condominium unit that appellants were to construct. Although the trial court determined, and we agree, that there was an ambiguity in the contract as to whether the initial down payment of $10,403 was a deposit or payment for options and extras, that ambiguity did not invalidate the contract. Nothing in *Page 14 
the record reveals that the contract was unfair, that it was the result of misrepresentation, fraud, mistake or surprise, or that its performance was oppressive upon appellants. It is noteworthy that appellants could have terminated the contract when it became clear that the costs of the project had substantially increased. They chose not to but, rather, gave Fine the option of paying the cost increase or terminating the contract. She chose neither option. Nevertheless, appellants continued the construction. The contract was capable of specific performance through a decree of the trial court and we cannot say that the court abused its discretion in ordering specific performance and carrying out what the parties intended to do under the contract. The first assignment of error is not well-taken.
 {¶ 33} Appellants second and third assignments of error will be addressed together as they both challenge the trial court's treatment of Fine's claim pursuant to the CSPA. Appellants assert that because the sale of the condominium unit was a pure real estate transaction within the meaning of all provisions of the Ohio Revised Code, it was outside the coverage of the CSPA and the trial court erred in finding that appellants violated that act in its sale of the unit to Fine. Appellants further contend that even if the CSPA applied to the sales transaction at issue, the lower court erred in finding that appellants violated the Act.
 {¶ 34} The CSPA provides that no supplier shall commit an unfair, deceptive or unconscionable act or practice in connection with a consumer transaction. R.C. 1345.02 and 1345.03. A supplier is "a seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting consumer transactions." R.C. 1345.01(C). A *Page 15 
consumer is "a person who engages in a consumer transaction with a supplier." R.C. 1345.01(D). A consumer transaction is defined as "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things." R.C. 1345.01(A). It is well-established that the CSPA does not apply to "pure" real estate transactions. Brown v. Liberty Clubs, Inc. (1989), 45 Ohio St.3d 191,193. The CSPA is, however, "applicable to the personal property or services portion of a mixed transaction involving both the transfer of personal property or services and the transfer of real property." Id. at the syllabus. In this regard, Ohio Adm. Code 109:4-3-01(C)(2) provides that "[s]ervices include, but are in no way limited to, the construction of a signal-family dwelling unit by a supplier on the real property of a consumer."
 {¶ 35} In Keiber v. Spicer Constr. Co. (1993), 85 Ohio App.3d 391, the Ohio Second District Court of Appeals addressed the issue of whether the CSPA applied to a real estate transaction involving the purchase of land coupled with a contract to construct a residence. The court stated that "[although the OCSPA has been deemed not to apply to the sale of a pre-existing residence, * * * a contract to build a new home is distinguishable; a residential contractor, especially when engaged in the design, construction, and sales of multiple dwellings, is a supplier of consumer-oriented services for purposes of the OCSPA. Purchasers of one window, or a home-improvement package, or repair services for air-conditioning machinery attached to the buyer's realty, *Page 16 
are all considered consumers under Ohio law. The fact that the consumer is also purchasing the land upon which his house will be built would not seem to make either the buyer any less a consumer or the transaction any less a consumer transaction." Id. at 394. The court further explained the reasons to distinguish the purchase of an existing residence and the purchase of land coupled with a contract for the construction of a residence, in light of the purpose of the OCSPA: "The buyer of an existing residence has the opportunity, if not the obligation, to inspect the premises before purchasing them. However, the purchaser of a contract to build a house has no such opportunity; he is dependent upon the integrity and ability of the construction contractor. Because of this distinction, there is a valid reason to extend the protections of the Act to the purchaser of a contract to build a house, even though the Act has been deemed not to apply to the mere purchase of existing real property." Id. at 396.
 {¶ 36} We find that Keiber is an appropriate interpretation of the CSPA and find that its interpretation applies equally to a contract for the construction of a condominium unit.
 {¶ 37} Appellants assert, however, that they cannot be held to have violated the CSPA because they were not the builder of the condominium unit at issue and, so, did not provide any goods or services to Fine in connection with a real estate transaction. The contract signed by the parties, however, belies appellants' assertion. Paragraph 5 of the contract is titled "Construction Undertaking" and expressly reads: "Seller shall build or complete the construction of the building in which the Unit is situated, and the Unit, in *Page 17 
accordance with the Drawings and the plans therefore on file at Seller's offices and by reference made a part of this agreement, and complete the same as soon as reasonably possible." Accordingly, under the terms of the contract, appellants undertook the responsibility of completing the construction of the condominium building. The fact that they subcontracted out the work does not change the fact that under the contract, appellants sold services to Fine in connection with a consumer transaction.
 {¶ 38} Finally, appellants assert that the lower court erred in finding that they violated the CSPA by refusing to sell Fine the condo in accordance with the terms of the offer.
 {¶ 39} R.C. 1345.05(B)(2) empowers the attorney general to "adopt, amend and repeal substantive rules defining with reasonable specificity acts or practices that violate sections 1345.02 [and] 1345.03 * * * of the Revised Code." The Ohio Attorney General has adopted such rules and they are set forth in Chapter 109 of the Ohio Administrative Code. Ohio Adm. Code 109:4-3-03(B)(3)(a) declares that "[i]t shall be a deceptive and unfair act or practice for a supplier to make an offer of sale of any goods or services when such offer is not a bona fide effort to sell such goods or services. An offer is not bona fide if:
 {¶ 40} "* * *
 {¶ 41} "(3) A supplier discourages the purchase or sale of the offered goods or services by any means, including but not limited to the following: *Page 18 
 {¶ 42} "(a) The refusal to show, demonstrate or sell the offered goods or services in accordance with the terms of the offer[.]"
 {¶ 43} The record demonstrates that appellants entered into a contract with Fine for the sale of the condominium unit for a total sale price of $142,990. That price included $10,403 for options and upgrades, defined as carpet, cabinets, countertops, curtain rods, the installation of those items, appliances, painting, electric fixtures, and HVAC units. It listed basic prices for those items and in paragraph 5 of the contract stated: "In the event that Seller is unable to obtain exact items or materials specified through its ordinary and usual sources of supply, it shall have the right to substitute items and materials of similar pattern, design and quality." Nevertheless, appellants unilaterally installed upgraded cabinets, granite countertops and other improvements without Fine's express written authority. On behalf of appellants, Gudenas then refused to close unless Fine paid an additional $10,500 for options and upgrades. In addition, in December 2001, Ed Gudenas wrote Fine and the other condominium buyers and, among other things, stated that he would be installing imported hand-carved, solid hardwood doors, valued at $1,200, as a no cost upgrade. Subsequently, Gudenas included these doors in the list of "quality extras" justifying the increased price of the units and listed the price of the doors at $2,000.
 {¶ 44} Although appellants' actions were not the standard "bait and switch" tactics commonly seen in CSPA cases, we do find that the evidence supported the trial court's *Page 19 
conclusion that appellants violated Ohio Adm. Code 109:4-3-03(B)(3)(a) by refusing to sell Fine the condominium at the agreed upon price.
 {¶ 45} Accordingly, the second and third assignments of error are not well-taken.
 {¶ 46} In their fourth assignment of error, appellants challenge the trial court's award of damages and attorney fees to Fine.
 {¶ 47} Appellants first assert that the lower court's award of damages resulting from an equitable accounting incident to the judgment for specific performance was erroneous. As noted above, the lower court awarded Fine economic damages totaling $125,044. In an action for specific performance, "any damages that may under the circumstances appear to be necessary, are matters in equity and may be determined by the trial court in its sound discretion." Sandusky Properties, supra at 274. Accordingly, the standard of review is whether the lower court, sitting as a court in equity, abused its discretion in its award of damages. Id. at 275.
 {¶ 48} In Sandusky Properties, supra at 275, the Supreme Court of Ohio addressed the issue of damages payable in specific performance actions. Quoting from Annotation (1949), 7 A.L.R. 2d 1211-1212, the court set forth the rule as follows:
 {¶ 49} "`When specific performance is granted of a contract to convey real property, the court will enforce the equities of the parties in such manner as to put them as nearly as possible in the position they would have occupied had the conveyance been made when required by the contract. It will compensate the purchaser for any loss of the use of the property during the delay by awarding him the rental value of it, or the net *Page 20 
rents and profits of it, for the period. It will compensate the vendor for any loss of the use of the purchase money during the delay by awarding him the appropriate interest for the proper period. To either party it will give credit for such expenditures in relation to the property, or otherwise occasioned by the delay, as should be borne by the other.'"
 {¶ 50} This statement of the law "is an attempt to place the parties in the relative position that they would have been in had the sale of the real estate proceeded according to the agreement. The seller should be reimbursed for his added expenses, as well as the loss of his use of capital funds. Conversely, the purchaser should have the benefits of the property that he would have received had he been in possession." Id. at 276.
 {¶ 51} In the proceedings below, appellants sought credits against the judgment for the 2005 and 2006 real estate taxes ($2,158.04), maintenance fees and assessments to the condominium association ($7,945.17), a special assessment to the condominium association ($1,000), electric bills for the unit from September 5, 2005 to September 5, 2007 ($2,83.90), and interest paid on the purchase price proceeds by appellants on the mortgage from December 23, 2004 to September 19, 2007 ($84,476.40). The lower court expressly declined to make the adjustments suggested, finding that the items listed were costs to appellants they never would have had to pay had they closed the matter in a timely fashion.
 {¶ 52} In our view, the lower court's refusal to make any adjustment requested by appellants appears punitive and unreasonable in light of the general rule set forth above that the court should seek to put the parties in the position they would have been in had *Page 21 
the sale proceeded according to the agreement. An equitable accounting ancillary to a decree for specific performance must be equitable to all parties. See, generally, Sandusky Properties.
 {¶ 53} Appellants further challenge the lower court's award to Fine of $97,469 for the rental value of the condo from December 24, 2004, until September 10, 2007. Some award for the rental value of the condo was clearly appropriate, particularly given that evidence before the court established that Ed Gudenas or someone with his permission, lived in the condo continuously since the summer of 2005. This issue will need to be revisited by the lower court upon its reevaluation of the damages issue.
 {¶ 54} Finally, appellants challenge the trial court's award of attorney fees totaling $65,582 to Fine. Appellants contend that there was little to no evidence to establish that the fees awarded were reasonable.
 {¶ 55} In the proceedings below, the court awarded Fine attorney fees pursuant to R.C. 1345.09(F)(2). That is, the court based its award upon its finding that appellants had violated the CSPA. R.C. 1345.09(F)(2) provides that in an action brought pursuant to the CSPA, "[t]he court may award to the prevailing party a reasonable attorney's fee limited to the work reasonably performed, if * * * [t]he supplier has knowingly committed an act or practice that violates this chapter." An award of attorney fees pursuant to R.C. 1345.09(F)(2) should not be reversed absent a showing of an abuse of discretion. Bittner v. Tri-CountyToyota, Inc. (1991), 58 Ohio St.3d 143, 146. When, however, there are claims in a case that can be separated into those for which attorney fees are recoverable *Page 22 
and those for which no fees are recoverable, "the trial court must award fees only for the amount of time spent pursuing the claim for which fees may be awarded." Id. at 145, citing Hensley v. Eckerhart (1983), 461 U.S. 424.
 {¶ 56} In the present case, Fine pursued claims against appellants based on breach of contract, specific performance and violations of the CSPA. The court held that appellants had breached the contract and awarded Fine specific performance and damages as discussed above. The court also determined that appellants violated the Ohio CSPA. Fine, however, is only entitled to an award of attorney fees based on her successful pursuit of the CSPA claim. In awarding Fine $65,582 in attorney fees, the lower court simply awarded the amount based on the total billings submitted by her counsel. To the extent the lower court awarded Fine fees based on her breach of contract and specific performance claims, the court abused its discretion. See Grieselding v.Krischak, 6th Dist. No. L-06-1010, 2007-Ohio-2668, ¶ 36.
 {¶ 57} In Bittner, supra at 146, the Supreme Court of Ohio further held that when awarding reasonable attorney fees pursuant to R.C. 1345.09(F)(2), to enable an appellate court to conduct a meaningful review, "the trial court must state the basis for the fee determination. Absent such a statement, it is not possible for an appellate court to conduct a meaningful review." In this vein, the court set forth a procedure for a court to follow in determining reasonable attorney fees:
 {¶ 58} "* * * the trial court should first calculate the number of hours reasonably expended on the case times an hourly fee, and then may modify that calculation by *Page 23 
application of the factors listed in DR 2-106(B). These factors are: the time and labor involved in maintaining the litigation; the novelty and difficulty of the questions involved; the professional skill required to perform the necessary legal services; the attorney's ability to accept other cases; the fee customarily charged; the amount involved and the results obtained; any necessary time limitations; the nature and length of the attorney/client relationship; the experience, reputation, and ability of the attorney; and whether the fee is fixed or contingent. All factors may not be applicable in all cases and the trial court has the discretion to determine which factors to apply, and in what manner that application will affect the initial calculation." Id. at 145-146.
 {¶ 59} In the present case, the lower court awarded Fine the full amount of attorney fees requested without explanation or indication that it had considered any of the stated factors. Accordingly, in addition to the court's error in apparently awarding Fine attorney fees for her breach of contract and specific performance claims, the court erred in failing to support its award with sufficient findings to allow us to conduct a meaningful review of the award on appeal. Upon remand, the court will need to determine what portion of the requested fees were incurred in pursuit of the CSPA claim and then evaluate the request in light of the factors set forth in Bittner. The fourth assignment of error is well-taken.
 {¶ 60} Appellee has pending before this court a motion for attorney fees and costs pursuant to App. R. 23. That rule reads: "If a court of appeals shall determine that an appeal is frivolous, it may require the appellant to pay reasonable expenses of the *Page 24 
appellee including attorney fees and costs." As we have determined that this appeal was not frivolous, appellee's motion for fees and costs is denied.
 {¶ 61} On consideration whereof, the court finds that substantial justice has not been done the parties complaining and the judgment of the Ottawa County Court of Common Pleas is affirmed in part and reversed in part. This case is remanded to the trial court for further proceedings consistent with this decision. Appellants and appellee are each ordered to pay one-half of the costs of this appeal pursuant to App. R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Ottawa County.
JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4.
Mark L. Pietrykowski, J., William J. Skow, P.J., Thomas J. Osowik, J., CONCUR. *Page 1